In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 08-1069 & 08-1089

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

LEROY F. MILLER and RICKY L. FINES,

*Defendants-Appellants*.

Appeals from the United States District Court for the
Northern District of Indiana, South Bend Division.
No. 3:04-cr-138—**Robert L. Miller, Jr.**, *Chief Judge*, and
**Allen Sharp**, *Judge*.

ARGUED SEPTEMBER 23, 2008—DECIDED OCTOBER 27, 2008

Before EASTERBROOK, *Chief Judge*, and KANNE and
TINDER, *Circuit Judges*.

EASTERBROOK, *Chief Judge*. Leroy Miller took in Ricky
Fines as a boarder at his farm. Both Miller and Fines are
interested in guns. They bought, refurbished, and sold
many weapons while Fines lived in Miller's house. Both
men cleaned guns on the same workbench—whether as
a joint venture, or each working on individually owned
weapons, is disputed but not important. When federal

agents conducted a search in April 2004, they found three weapons in the house and 31 in a shed nearby. The guns in the shed had been wiped clean of fingerprints and wrapped in blankets; the jury was entitled to infer that Fines and Miller had moved the guns to the shed in anticipation of a search. And why should they fear a search? Because Fines had a felony conviction, and Miller (whose own record was clean) knew it. A jury convicted Fines of possessing weapons despite his conviction, in violation of 18 U.S.C. §922(g)(1), and Miller of aiding and abetting Fines's illegal possession. See 18 U.S.C. §2. Fines was sentenced to 48 months' imprisonment and Miller to 10 months.

Miller contends that he is innocent, because he did not learn of Fines's criminal history until shortly before the search, and that after learning of Fines's conviction he did not allow Fines to handle guns—indeed, that the guns had been moved from the house to the shed before Fines became a boarder. In an interview with federal agents, however, Miller admitted that he learned of Fines's conviction in November 2002, give or take a few months. Evidence about the weapons' condition allowed the jury to infer that they had not entered the shed until the spring of 2004. (The shed was leaky and dirty, yet the weapons were in pristine condition.) Three guns were in the farmhouse when federal agents arrived. A sensible jury could find that Miller permitted Fines to work on guns with Miller's tools after November 2002. This is enough evidence to support the conviction for aiding and abetting; the record has additional evidence, but we need not canvass everything.

The evidence is also quite sufficient to support Fines's conviction. He maintains that the district judge should not have admitted two pictures of him, saluting, while sitting in a chair under a gun rack, or a folder of receipts showing that Fines had ordered and paid for gun parts. He argues that the pictures do not depict the condition of the room when the agents searched it, but that's beside the point. Fines is guilty if he possessed guns any time during five years (the period of limitations) before the indictment. The pictures are relevant because they show that guns and Fines were in the room together, which supports an inference that he possessed them. The receipts were hearsay if offered for the truth of the sellers' (implied) assertions that the parts had been delivered as ordered, but to the extent they embodied Fines's statements they were admissible under Fed. R. Evid. 801(d)(2) as admissions, and to the extent that they reflected the sellers' business records they were admissible under Fed. R. Evid. 803(6). They were admissible, moreover, simply to show that Fines (in whose room the documents were found) paid for components of weapons. This undermined his defense that only Miller had anything to do with the guns. See *United States v. Serrano*, 434 F.3d 1003 (7th Cir. 2006).

Miller's sentence is the final subject in dispute. He maintains that the sentence should be reduced under U.S.S.G. §2K2.1(b)(2):

> If the defendant . . . possessed all ammunition and firearms solely for lawful sporting purposes or

collection, and did not unlawfully discharge or otherwise unlawfully use such firearms or ammunition, decrease the offense level determined above to level **6**.

Miller describes himself as a collector and his guns as "entry-level collectables". The district court held that Miller could not be treated as a collector because he refurbished some of the guns, sold them, and used the proceeds to buy others. The judge stated that once Miller sold a gun, "even if he did so as a step toward improving the collection, he no longer possessed it for collection. I don't think that the guideline reduction contemplates sales for collection, as distinct from acquisition, or simple continued possession."

The sale of a single weapon does not inevitably prevent a person from being a collector under §2K2.1(b)(2). Collectors—whether of coins, stamps, baseball cards, comic books, paintings, or guns—regularly buy and sell in order to shed duplicates or less desirable items and acquire replacements that they value more highly. The text of §2K2.1(b)(2) does not exclude from its coverage collectors who sell some holdings as a means of improving the collection as a whole, any more than it excludes those who buy or barter with that goal in view. Collectors who use markets are still collectors. Cf. *United States v. Collins*, 313 F.3d 1251, 1255 (10th Cir. 2002) (same proposition with respect to guns used for sporting).

Application Note 6 to §2K2.1 says that "lawful sporting purposes or collection" must be ascertained from the surrounding circumstances and that

> [r]elevant surrounding circumstances include the number and type of firearms, the amount and type of ammunition, the location and circumstances of possession and actual use, the nature of the defendant's criminal history (e.g., prior convictions for offenses involving firearms), and the extent to which possession was restricted by local law.

The note does not identify the use of market transactions as a circumstance disqualifying persons from the benefit of §2K2.1(b)(2). Nor does any appellate decision hold that selling to improve a collection makes §2K2.1(b)(2) inapplicable. We conclude that a person who sells weapons can remain a collector, unless the sales are so extensive that the defendant becomes a dealer (a person who trades for profit) rather than a collector (a person who trades for betterment of his holdings). See *United States v. Clingan*, 254 F.3d 624 (6th Cir. 2001). Being an unlicensed dealer is an aggravating rather than a mitigating circumstance.

The United States contends that Miller refurbished and sold guns for income, and that what he calls a collection is better understood as inventory. The district court did not make findings on questions that would be pertinent to this distinction, such as whether Miller continually improved the scope and quality of his holdings or instead replaced the weapons he sold with similar ones in order to meet demand. Nor did the judge make findings pertinent to the prosecutor's argument that *bona fide* collectors do not keep their prizes in leaky sheds. It is unnecessary to remand for findings on these topics,

because §2K2.1(b)(2) applies only when "all" of the fire-arms were used for sporting or collection.

Agents found three operational weapons in the house. One of these, a loaded Mossberg shotgun, was in the downstairs corridor, immediately outside Fines's door. Miller concedes that he kept the shotgun for security against intruders, rather than as part of a collection. It follows that §2K2.1(b)(2) does not reduce Miller's offense level. See *United States v. Hanson*, 534 F.3d 1315 (10th Cir. 2008); *United States v. Bertling*, 510 F.3d 804, 811 (8th Cir. 2007); *United States v. Shell*, 972 F.2d 548 (5th Cir. 1992).

AFFIRMED